UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

```
-----------------------------x
                             :
GARY BEDOR,                  :
                             :
        Plaintiff,           :
                             :
v.                           : Civil No.3:01CV02146(AWT)
                             :
FRIENDLY'S ICE CREAM CORP.,  :
                             :
        Defendant.           :
                             :
-----------------------------x
```

## MEMORANDUM OF DECISION

The plaintiff, Gary Bedor ("Bedor") brings this action against Friendly's Ice Cream Corp. ("Friendly's"), alleging various causes of action under federal and Connecticut state employment discrimination statutes. Bedor claims that the defendant unlawfully terminated his employment: (1) in retaliation for the exercise of his rights under the Family Medical Leave Act ("FMLA"), 29 U.S.C. § 2601, et seq.; (2) because of his age in violation of the Age Discrimination in Employment Act ("ADEA"), 29 U.S.C. § 621, et seq., and the Connecticut Fair Employment Practices Act ("CFEPA"), Conn. Gen. Stat. § 46a-60, et seq.; and (3) because of his disability in violation of the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12101, et seq., and CFEPA. The defendant moves for

summary judgment on each of the plaintiff's claims.  For the
reasons set forth below, the court is granting the defendant's
motion with respect to the plaintiff's disability
discrimination claims under the ADA and CFEPA and denying the
defendant's motion with respect to the plaintiff's FMLA
discrimination claim and his age discrimination claims under
the ADEA and CFEPA.

## I.    FACTUAL BACKGROUND

The plaintiff began working for the defendant in 1966 as a
part-time dishwasher while attending high school.  After
graduating from high school, the plaintiff continued to work
for the defendant full-time.  By 1972, the plaintiff had been
promoted to general manager, responsible for the operations of
one of the defendant's restaurants.  From 1976 until his
termination on August 8, 2000, the plaintiff worked as a
district manager, responsible for the supervision of a number
of the defendant's restaurants contained within a geographic
region.  Prior to a reorganization in March of 2000, general
managers reported to district managers, who reported in turn to
division managers; division managers reported to the vice
president of operations, who in turn reported to the president.
From 1979 until the date of his termination, the plaintiff was

assigned as a district manager for varying groupings of restaurants located in the vicinity of Hartford, Connecticut.

The plaintiff's performance evaluations for the period 1996 through 1999 were signed by his direct supervisor, division manager Richard Damarjian.  For the years 1996 and 1997, Damarjian gave the plaintiff an overall performance rating of "Excellent"; for the years 1998 and 1999, the plaintiff received an overall rating of "Fully Satisfactory", which is one step below Excellent.

The plaintiff's performance record for 1999 was blemished when one of the restaurants in the plaintiff's district was cited in April and August for violations of state child labor laws.  The incidents resulted in the termination of that restaurant's general manager.  The defendant considered the plaintiff's involvement in the incident to be deserving of termination, as well, but in light of the plaintiff's many years of satisfactory performance it placed him on a ninety-day probationary period.  The notice of probation was signed by Damarjian and Michael Maglioli, the vice president of restaurant operations.

In the plaintiff's 1999 performance evaluation Damarjian documents that the plaintiff's performance following the disciplinary action was noticeably improved.  Whereas during

the pre-probation part of 1999 Damarjian would have rated the plaintiff's performance as "Fair Needs Improvement," "during and following the probationary period, [the plaintiff's] performance and results were clearly [Fully Satisfactory] with above average shopper scores, above budget financial performance, and the recruitment of two [general managers]. We need to continue the trend of the second half of the year . . . ." (Pl.'s Opp. Mem. (Doc. No. 29), Ex. 5 at 6 [hereinafter "Pl.'s Ex. ___"].) This document was signed by Damarjian and Maglioli.

In 1999, the plaintiff was ranked twenty-fifth out of forty-nine district managers in terms of <u>actual</u> sales and cash flow compared to <u>budgeted</u> sales and cash flow. In early 2000, for the period February 6 to March 14, the plaintiff's district was ranked second out of forty-nine districts by Mystery Shoppers, an independent customer service evaluation firm.

In September or October of 1999, the plaintiff informed the defendant that he had been diagnosed with prostate cancer. In order to undergo prostate surgery, the plaintiff took leave under the FMLA from March 1, 2000 to May 15, 2000. During the period the plaintiff was on medical leave, the defendant underwent a reorganization. In March it closed approximately 100 restaurants. The defendant reorganized its twelve

divisions into seven regions; the districts within these regions were reorganized into different groupings of restaurants, which resulted in a reduced number of districts and the elimination of five district manager positions, and Maglioli decided which individuals would be terminated.

Maglioli selected four district managers for termination because their division managers reported poor or declining performance. When asked about his rationale for picking the fifth district manager, Steve Sismanoglou, for termination, Maglioli mentioned the fact that Sismanoglou was on disability leave:

> He was out on a disability at that point in time. Most of the restaurants in the area that he worked closed, so it made him an automatic; whether his performance was good, bad or indifferent, there was no need for a district manager in that area.

(Dep. Excerpts (Doc. No. 28), Maglioli Dep. at 47 [hereinafter "Maglioli Dep. at ___"].) The plaintiff and Sismanoglou were the only district managers on disability leave at the time of the reorganization.

The defendant claims that during the reorganization it was contemplating the elimination of the plaintiff's position as well. Maglioli averred in his affidavit that he was planning to terminate the plaintiff as part of the reorganization, first, because of declining performance and, second, because

three of the plaintiff's six restaurants were designated for closing and were closed.  With respect to the first rationale, Maglioli testified in his deposition that the bases for his assessment that the plaintiff's performance was declining were the plaintiff's performance evaluations and the comments of Damarjian.  However, Damarjian stated in his affidavit that (1) the plaintiff was always "a solid consistent performer" (Damarjian Aff. (Doc. No. 26) ¶¶ 4, 5); (2) Maglioli did not consult him about the decision to reassign the plaintiff during the reorganization (<u>id.</u> ¶ 5); (3) Damarjian informed Maglioli of his opinion that the plaintiff was "a solid, consistent performer" (<u>id.</u>); and (4) he never told Maglioli that the plaintiff's performance was deteriorating (<u>id.</u> ¶ 6).

The plaintiff argues that Maglioli's claim that he was going to terminate the plaintiff because of poor performance is further contradicted by the fact that the defendant retained Angela Mastropolo, a younger district manager who had received a 1999 performance evaluation rating of "Needs Improvement", which -- though upgraded in February of 2000 to "Satisfactory" -- stands in contrast to the plaintiff's "Fully Satisfactory" rating for 1999, especially in light of the fact that the defendant remained concerned about Mastropolo's financial results despite her upgraded rating.  The defendant emphasizes

the supposed remarkable improvement by Mastropolo, but
Damarjian's description of the marked improvement in the
plaintiff's performance during the second part of 1999 compared
to the first part of 1999 could be seen as more compelling than
the commentary in Mastropolo's 2000 follow-up evaluation.
Also, Mastropolo did not attain a rating of "Fully
Satisfactory", but merely received a rating of "Satisfactory",
which was qualified by the defendant's concern about her
financial results.  Not only was the younger Mastropolo not
terminated, but she was moved into the region that comprised
the plaintiff's division before his leave.

Maglioli's second rationale was that three of the
plaintiff's six restaurants were closed.  However, the
defendant's records indicate that during 2000 only one of the
six restaurants was closed.  The other five remained open, and
the defendant reassigned them to two other district managers.

In any event, Maglioli's deposition and affidavit
testimony is that he changed his mind about terminating the
plaintiff when a district manager suddenly left the company.
Instead of terminating the plaintiff, Maglioli reassigned him
to a district in the vicinity of Framingham, Massachusetts,
approximately 60 miles from the plaintiff's home in Ellington,
Connecticut.  Maglioli testified that he opted for

reassignment, despite his assessment that the plaintiff's performance was declining, because of the plaintiff's many years of service and his hopes that a new district with unknown general managers would provide the plaintiff "an opportunity to turn his performance around." (Attach. to Def.'s Mot. Summ. J. (Doc. No. 13), Maglioli Aff. ¶ 23 [hereinafter "Maglioli Aff. ¶ ___"].)

The evidence submitted by the plaintiff contradicts Maglioli's stated reasons for reassigning the plaintiff to Massachusetts. The plaintiff's restaurants were reassigned to two district managers who were fourteen and seven years younger than the plaintiff, were not disabled, and had not recently taken FMLA leave. Moreover, the plaintiff's new district in Massachusetts contained some of the defendant's poorest performing stores and had gone without the attention of a district manager for a number of months. Neither the defendant nor Maglioli have been able to identify the district manager whose sudden departure led Maglioli to change his mind about terminating the plaintiff. Additionally, the defendant reassigned the other district managers in the plaintiff's old district to restaurants at least as close if not closer to their homes, such that their post-reorganization commutes either stayed the same or decreased by up to twelve miles,

whereas the plaintiff was reassigned to a Massachusetts
district that would have increased his daily commute by forty-
two miles.  Finally, each of these other district managers were
seven to fifteen years younger than the plaintiff and were not
on disability leave at the time of the reorganization.

The defendant communicated the decision to reassign the
plaintiff to him while he was still out on disability leave.
The plaintiff refused the reassignment because his doctor did
not approve of the increase in travel time during his
postoperative recovery period and the plaintiff and his doctor
believed that the increased stress of dealing with poorly
performing stores coupled with the increased commute would be
too much for the plaintiff to handle while recovering from
surgery.  At this point the plaintiff did not know whether his
cancer had been successfully treated, and the plaintiff also
suffered from urinary incontinence and erectile dysfunction;
the latter condition will to some degree remain a permanent
condition.

After the plaintiff refused to accept the reassignment,
instead of eliminating the plaintiff's position as Maglioli
asserts he had planned to do before the departure of another
district manager, Maglioli created an unbudgeted "incremental
district" in the Hartford, Connecticut area.  This new

incremental district was to be temporary in that the poorest performing district manager would be terminated after some indefinite period. Maglioli did not inform anyone that this incremental district would be temporary.

On May 15, 2000, the plaintiff returned to work. After a period of training on new district manager procedures, the plaintiff assumed his position as district manager and began reporting to his new immediate supervisor, Ken Milley; Milley supervised the plaintiff until he was terminated on August 8, 2000. Milley believed the plaintiff's performance as a district manager was average. Also, during this period the defendant's president, John Cutter, personally called the plaintiff to compliment him on one of the plaintiff's restaurants because Cutter had received a call from one of the defendant's investors who was impressed with the work being done in that restaurant.

The defendant maintains that upon his return to work the plaintiff resisted learning the company's new district manager procedures. Maglioli averred that Gerry Sinsigalli, the former president of the defendant's Food Service organization, told him that the plaintiff referred to a required demonstration of the new procedures as a "dog and pony show." (Maglioli Aff. ¶ 28.) According to Maglioli, two other executives of the

defendant, Ron Meese and Jack Lutrell, informed Maglioli of the plaintiff's negative attitude toward the new district manager procedures, saying that he even referred to them as "B.S." (Maglioli Dep. at 127.)  Maglioli also testified in his deposition and affidavit that during this same period the plaintiff exhibited "total insubordination" by failing to follow Milley's orders to go to the airport to meet a training supervisor who had arrived from Florida where he had possibly been exposed to hepatitis.  (Id. at 122-26.)  Finally, in August of that year -- days before the plaintiff's termination -- Maglioli and Cutter paid a routine, unannounced visit to one of the plaintiff's restaurants.  They claim that they found that the plaintiff had not executed a mandatory district manager checklist, the kitchen and store rooms were substandard for cleanliness, and it was obvious that the plaintiff was unfamiliar with the routine.

The plaintiff points to evidence contradicting Maglioli's testimony regarding the plaintiff's supposed resistance to the defendant's new procedures and the plaintiff's alleged insubordination.  While Sinsigalli does recall a comment by the plaintiff referring to the new district manager routine as a "dog and pony show", Sinsigalli's affidavit does not impute the same negative attitude to the defendant that Maglioli claims

Sinsigalli reported to him.  Moreover, neither Meese nor
Luttrell recalled telling Maglioli that the plaintiff referred
to the new district manager procedures in a derogatory manner
or called them "B.S."  With regard to the supposed hepatitis
incident, Milley, who was the plaintiff's immediate supervisor
at the time of the alleged incident, could recall no incident
of insubordination by the plaintiff; and Milley recalled only
one incident where trainers were exposed to hepatitis, which
occurred during a period when he did not supervise the
plaintiff.  Finally, the plaintiff avers that on the day of
Maglioli and Cutter's surprise inspection he was in the midst
of going through the lengthy process of certifying a general
manager to be a trainer; as a result he had not yet had the
time to do the district manager routine for that day.  When
Maglioli ordered the plaintiff to perform the routine, Maglioli
denied the plaintiff the opportunity to retrieve from his car
the checklist needed to perform the routine.  The plaintiff
denies that the restaurant was in poor condition.

On August 8, 2000, the defendant terminated the plaintiff.
The plaintiff avers that the reason for the termination stated
originally was that his district was being eliminated as part
of a reorganization, that his position was being eliminated,
and that the termination was not related to any issue

concerning the plaintiff's performance.  However, a human
resources e-mail dated August 15, 2000, indicates that the
defendant was actively seeking to recruit new district
managers, not to reduce their number.  The plaintiff was the
only district manager in his region who was terminated in
August of 2000, and the defendant proceeded to hire one new
district manager in September and three more in November; all
four of the newly hired district managers were at least ten
years younger than the plaintiff.

     After his termination, the plaintiff filed claims with the
Connecticut Commission on Human Rights and Opportunities
("CHRO") and the U.S. Equal Employment Opportunity Commission
("EEOC").  In a CHRO filing, the defendant did not mention
anything about a reorganization or reduction in force as a
rationale for terminating the plaintiff.  It stated three
specific reasons for termination, including that the plaintiff
had been a marginal performer, that he made negative comments
regarding the new district manager procedures, and the negative
findings by Maglioli and Cutter during the surprise inspection
in August 2000.  During the course of the instant litigation,
the defendant continued to give as its rationale for
terminating the plaintiff's employment the three reasons
mentioned in the CHRO filing, and added two other reasons, i.e.

13

the 1999 child labor law violations and the alleged hepatitis incident.

## II.  **LEGAL STANDARD**

A motion for summary judgment may not be granted unless the court determines that there is no genuine issue of material fact to be tried and that the facts as to which there is no such issue warrant judgment for the moving party as a matter of law.  Fed. R. Civ. P. 56(c).  See Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986); Gallo v. Prudential Residential Servs., 22 F.3d 1219, 1223 (2d Cir. 1994).  Rule 56(c) "mandates the entry of summary judgment . . . against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." Celotex Corp., 477 U.S. at 322.

When ruling on a motion for summary judgment, the court must respect the province of the jury.  The court, therefore, may not try issues of fact.  See, e.g., Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986); Donahue v. Windsor Locks Bd. of Fire Comm'rs, 834 F.2d 54, 58 (2d Cir. 1987); Heyman v. Commerce & Indus. Ins. Co., 524 F.2d 1317, 1319-20 (2d Cir. 1975).  It is well-established that "[c]redibility determinations, the weighing of the evidence, and the drawing

of legitimate inferences from the facts are jury functions, not those of the judge." Anderson, 477 U.S. at 255. Thus, the trial court's task is "carefully limited to discerning whether there are any genuine issues of material fact to be tried, not to deciding them. Its duty, in short, is confined . . . to issue-finding; it does not extend to issue-resolution." Gallo, 22 F.3d at 1224.

Summary judgment is inappropriate only if the issue to be resolved is both genuine and related to a material fact. Therefore, the mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment. An issue is "genuine . . . if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Anderson, 477 U.S. at 248 (internal quotation marks omitted). A material fact is one that would "affect the outcome of the suit under the governing law." Id. Thus, only those facts that must be decided in order to resolve a claim or defense will prevent summary judgment from being granted. Immaterial or minor facts will not prevent summary judgment. See Howard v. Gleason Corp., 901 F.2d 1154, 1159 (2d Cir. 1990).

When reviewing the evidence on a motion for summary judgment, the court must "assess the record in the light most

favorable to the non-movant and . . . draw all reasonable inferences in [its] favor." <u>Weinstock v. Columbia Univ.</u>, 224 F.3d 33, 41 (2d Cir. 2000). Because credibility is not an issue on summary judgment, the nonmovant's evidence must be accepted as true for purposes of the motion. Nonetheless, the inferences drawn in favor of the nonmovant must be supported by the evidence. "[M]ere speculation or conjecture" is insufficient to defeat a motion for summary judgment. <u>Western World Ins. Co. v. Stack Oil, Inc.</u>, 922 F.2d 118, 121 (2d Cir. 1990) (citation and quotation marks omitted). Moreover, the "mere existence of a scintilla of evidence in support of the [nonmovant's] position will be insufficient; there must be evidence on which a jury could reasonably find for the nonmovant." <u>Anderson</u>, 477 U.S. at 252.

Finally, the nonmoving party cannot simply rest on the allegations in its pleadings since the essence of summary judgment is to go beyond the pleadings to determine if a genuine issue of material fact exists. <u>See</u> <u>Celotex Corp.</u>, 477 U.S. at 324. "Although the moving party bears the initial burden of establishing that there are no genuine issues of material fact," <u>Weinstock</u>, 224 F.3d at 41, if the movant demonstrates an absence of such issues, a limited burden of production shifts to the nonmovant, which must "demonstrate

16

more than some metaphysical doubt as to the material facts,
. . . [and] must come forward with specific facts showing that
there is a genuine issue for trial." Aslanidis v. United
States Lines, Inc., 7 F.3d 1067, 1072 (2d Cir. 1993) (quotation
marks, citations and emphasis omitted). Furthermore,
"unsupported allegations do not create a material issue of
fact." Weinstock, 224 F.3d at 41. If the nonmovant fails to
meet this burden, summary judgment should be granted. The
question then becomes whether there is sufficient evidence to
reasonably expect that a jury could return a verdict in favor
of the nonmoving party. See Anderson, 477 U.S. at 248, 251.

## III. **DISCUSSION**

### A.    **FMLA Claim**

The plaintiff asserts that the defendant violated the
FMLA in connection with his FMLA leave by subjecting him to
adverse employment actions by failing to return the plaintiff
to his previous position or an equivalent one by attempting to
reassign him to the district in the vicinity of Framingham,
Massachusetts, then after the plaintiff refused that
reassignment, by assigning him to serve as district manager
for the newly created "incremental unbudgeted district", and
by terminating his employment on August 8, 2000.

The FMLA provides in pertinent part that:

17

**(a)  Interference with rights**

    **(1)  Exercise of rights**

      It shall be unlawful for any employer to interfere with, restrain, or deny the exercise of or the attempt to exercise, any right provided under this subchapter.

    **(2)  Discrimination**

      It shall be unlawful for any employer to discharge or in any other manner discriminate against any individual for opposing any practice made unlawful by this subchapter.

**(b)  Interference with proceedings or inquiries**

      It shall be unlawful for any person to discharge or in any other manner discriminate against any individual because such individual-

    (1) has filed any charge, or has instituted or caused to be instituted any proceedings, under or related to this subchapter;
    (2) has given, or is about to give, any information in connection with any inquiry or proceeding related to any right provided under this subchapter; or
    (3) has testified, or is about to testify, in any inquiry or proceeding relating to any right provided under this subchapter.

29 U.S.C.A. § 2615(a), (b) (West 1999).  The related

Department of Labor implementing regulations provide in

pertinent part that:

    (c) An employer is prohibited from discriminating against employees or prospective employees who have used FMLA leave.  For example, if an employee on leave without pay would otherwise be entitled to full benefits (other than health benefits), the same benefits would be required to be provided to an

18

> employee on unpaid FMLA leave.  By the same token,
> employers cannot use the taking of FMLA leave as a
> negative factor in employment actions, such as
> hiring, promotions or disciplinary actions; nor can
> FMLA leave be counted under "no fault" attendance
> policies.

29 C.F.R. § 825.220(c) (2005).

There is a split of authority on the question of whether the McDonnell Douglas burden-shifting framework should be applied in cases where a plaintiff claims he was subjected to an adverse employment action because he exercised his right to take leave under the FMLA, although the Second Circuit has not addressed the issue.  Compare, e.g., Chaffin v. Carter Co., 179 F.3d 316, 319 (5th Cir. 1999) ("when direct evidence of discrimination is lacking, the McDonnell Douglas organizational framework applies to claims that an employee was penalized for exercising rights guaranteed by the FMLA"), and King v. Preferred Technical Group, 166 F.3d 887, 891 (7th Cir. 1999) ("When a plaintiff alleges a retaliatory discharge under other anti-discrimination laws, courts employ the familiar burden-shifting framework established by the Supreme Court in McDonnell Douglas Corp. v. Green, 411 U.S. 792, 800-06, 93 S. Ct. 1817, 36 L. Ed. 2d 668 (1973), in the absence of direct evidence of an employer's intent."), and Hodgens v. General Dynamics Corp., 144 F.3d 151, 160 (1st Cir. 1998)

("[W]hen there is no direct evidence of discrimination, the
McDonnell Douglas burden-shifting framework applies to claims
that an employee was discriminated against for availing
himself of FMLA-protected rights."), with Bachelder v.
American West Airlines, Inc., 259 F.3d 1112, 1124-25 (9th Cir.
2002) (plaintiff "need only prove by preponderance of the
evidence that her taking of FMLA-protected leave constituted a
negative factor in the decision to terminate her," and she
does not have to meet traditional anti-discrimination law
standard under McDonnell Douglas), and Mann v. Mass. Correa
Elec., J.V., No. 00 CIV. 3559(DLC), 2002 WL 88915, at *6
(S.D.N.Y. Jan. 23, 2002) (claim of retaliatory discharge for
taking FMLA-protected leave is not governed by McDonnell
Douglas and requires no showing of discriminatory intent)
(citing Bachelder, 259 F.3d at 1124-25)).  Courts have also
differed on whether they view the taking of such an adverse
employment action as a violation of § 2615(a)(1) or as a
violation of § 2615(a)(2) and/or (b).  Compare Bachelder, 259
F.3d at 1124-25 (claim of retaliatory discharge for taking
FMLA-protected leave construed as an interference claim
brought under § 2615(a)(1) because it "does not fall under the
'anti-retaliation' or 'anti-discrimination' provision of

§ 2615(a)(2)"), and Mann, 2002 WL 88915, at *6 (claim of
retaliatory discharge for taking FMLA-protected leave is not a
claim of retaliation for opposing unlawful practices, nor a
claim of discrimination for participating in an FMLA
proceeding, but "is properly brought as an interference claim
under Section 2615(a)(1)"), with Merli v. Bill Commc'ns, Inc.,
No. 01 Civ. 0359(LMM), 2002 WL 424649, at *5 (S.D.N.Y. March
18, 2002) (claim of retaliatory discharge for requesting FMLA-
protected leave construed as claim brought under § 2615(a)(2)
and (b)), and Kaylor v. Fannin Reg'l Hosp., Inc., 946 F. Supp.
988, 999 (N.D. Ga. 1996) (claim of retaliatory discharge for
taking FMLA-protected leave construed as claim falling under
§ 2615(a)(2), which provision "[c]omplement[s] § 1615(a)(1)"
by "prohibit[ing] discrimination against any employee who
attempts to exercise his rights under the FMLA").

The defendant contends that the more rigorous McDonnell
Douglas burden-shifting framework should be applied in this
case. The plaintiff's position is that the court need not
reach this issue for purposes of this motion because, in any
event, the plaintiff satisfies the McDonnell Douglas standard.
The court agrees.

"Under the familiar burden-shifting paradigm set forth in
McDonnell Douglas Corp. v. Green, 411 U.S. 792, 803 . . . , a

plaintiff claiming discrimination must first satisfy the <u>de minimus</u> burden of establishing, by a preponderance of the evidence, a prima facie case of retaliation." <u>Bond v. Sterling, Inc.</u>, 77 F. Supp. 2d 300, 303 (N.D.N.Y 1999)(citations omitted).  If the plaintiff successfully establishes a prima facie case of retaliation, then the burden of production shifts to the employer, who may rebut the resulting presumption of discrimination by offering legitimate, nondiscriminatory reasons for the adverse employment action.  <u>See</u> <u>Bickerstaff v. Vassar College</u>, 196 F.3d 435, 446 (2d Cir. 1999).  Nevertheless, the plaintiff bears the ultimate burden of persuasion.  <u>See</u> <u>St. Mary's Honor Center v. Hicks</u>, 509 U.S. 502, 507 (1993).  If the defendant offers a legitimate, nondiscriminatory reason for the employment decision, the plaintiff may then proceed to present evidence that the proffered reasons are false and are a pretext for discrimination.  <u>See</u> <u>Bickerstaff</u>, 196 F.3d at 446. While the plaintiff is not <u>required</u> to prove the falsity of the defendant's proffered reasons, doing so is "one means to support her ultimate burden of proving discrimination."  <u>Id.</u> at 447.  "The factfinder's disbelief of the reasons put forward by the defendant . . . may, together with the elements of the prima facie case, suffice to show intentional

22

discrimination." St. Mary's Honor Center, 509 U.S. at 511.

"Thus, rejection of the defendant's proffered reasons will

*permit* the trier of fact to infer the ultimate fact of

intentional discrimination, . . . [and] upon such rejection,

no additional proof of discrimination is *required* . . . [but

such rejection does not] *compel*[] judgment for the plaintiff

. . . ." Id. (emphasis in original) (citations and internal

quotation marks omitted).

    To establish a prima facie case of retaliation, the

plaintiff must demonstrate that (1) he availed himself of a

protected right under the FMLA; (2) he suffered an adverse

employment action; and (3) there is a causal connection

between the protected activity and the adverse action. See

Bond, 77 F. Supp. 2d at 303; Hodgens, 144 F.3d at 161; cf.

Richardson v. New York State Corr. Serv., 180 F.3d 426, 443

(2d Cir. 1999) (reciting standard in Title VII retaliation

case).

    It is undisputed that the plaintiff availed himself of a

protected right under the FMLA by taking approved, FMLA-

protected medical leave, for the period March 1 through May

15, 2000, to undergo and recover from prostate surgery as

treatment for cancer. Likewise, the defendant does not

dispute that the plaintiff suffered an adverse employment

action in that it terminated his employment on August 8, 2000, less than three months following his return from his FMLA leave.

The plaintiff asserts that he was subjected to two additional adverse employment actions prior to his termination.  First, the defendant failed to return him to his previous position or an equivalent one, but assigned him to a district much further from his home and which contained restaurants that were performing poorly compared with those previously under his care.  Second, after the plaintiff refused the reassignment to Massachusetts and before his ultimate termination, the defendant reassigned him to a district manager position that was temporary in nature -- i.e, as manager of a newly created "incremental unbudgeted district".

An employment action is adverse when it constitutes a materially adverse change in the plaintiff's terms and conditions of employment.  Richardson, 180 F.3d at 446.  Some courts have held that an increased commute alone does not satisfy this standard.  See, e.g., Sanchez v. Denver Pub. Sch., 164 F.3d 527, 532 (10th Cir. 1998) (commute increased from between five and seven minutes to between thirty and forty minutes).  At least one court has found that an

increased commute could constitute an adverse employment

action.  See Raffaele v. City of New York, No. 00-CV-3837

(DGT)(RLM), 2004 WL 1969869, at *19 (E.D.N.Y. Sept. 7, 2004)

(Although a semi-weekly round-trip commute of 75 miles is

arguably not adverse, "a reasonable jury could conclude, given

all the circumstances of the case, including Raffaele's

medical and family needs, that the transfer to the Bronx and

refusals of requested transfers out of the Bronx were

sufficiently adverse to qualify as actionable.")

    In this case, however, the plaintiff is not merely

claiming that he would have had to drive farther to get to and

from work everyday.  He complains that he had been assigned to

an area that contained under-performing stores that would

require much more attention than usual, that in addition he

would have to spend much more time driving in order to carry

out the assignment, and that this increased commute would be

especially taxing during a period when he was still recovering

from major surgery.  In addition, the commute in this case is

not simply a commute to and from an office.  Rather, it is an

essential part of the job of the district manager to be able

to drive throughout the day to different stores within his

district.  A reasonable trier of fact could find that such a

combination of facts constitutes an adverse employment action.

Thus, the plaintiff's second claim of an adverse employment action could support the second prong of the prima facie case.

As to the plaintiff's third claim of an adverse employment action, the defendant does not dispute that transfer from a permanent position to one that is temporary constitutes an adverse employment action; it merely defends its action as being not based upon discrimination. (See Def.'s Reply Mem. at 8.) A reasonable trier of fact could find that the reassignment to the incremental district constituted an adverse employment action. See, e.g., Brown v. Cox, 286 F.3d 1040, 1045-46 (8th Cir. 2002) (adverse employment action where, inter alia, defendant removed plaintiff from permanent position and placed her in temporary one).

In support of the third element of the prima facie case, i.e. a causal connection between the protected activity and the adverse employment action, the plaintiff has satisfied his minimal burden. A plaintiff can establish causal connection "indirectly with circumstantial evidence, for example, by showing that the protected activity was followed by discriminatory treatment or through evidence of disparate treatment of employees who engaged in similar conduct or directly through evidence of retaliatory animus." Sumner v.

U.S. Postal Serv., 899 F.2d 203, 209 (2d Cir. 1990) (citations omitted); cf. Treglia v. Town of Manlius, 313 F.3d 713, 720 (2d Cir. 2002) (final element of prima facie retaliation established if plaintiff shows "allegedly adverse actions occurred in circumstances from which a reasonable jury could infer retaliatory intent").

The defendant argues that the plaintiff cannot, as a matter of law, demonstrate causal connection because the three-month interval between the end of the plaintiff's leave and the date of his termination is insufficient.  The plaintiff does not, however, rely on timing as the sole evidence of causal connection.  The plaintiff points to the fact that (1) his duties were reassigned to district managers who had not exercised their protected leave rights and (2) the defendant terminated the only other district manager on disability leave at the time of the restructuring and admitted in substance that the manager's leave status was a factor in the termination decision.  The defendant contends that Maglioli's statement was not an admission, rather merely a coincidental statement, but a reasonable trier of fact could construe Maglioli's statement as the plaintiff does.  When viewed in the light most favorable to the plaintiff, the totality of the circumstantial evidence produced by the

plaintiff is sufficient and rises to the minimum level of proof required to establish a causal connection between the protected activity and the three subsequent adverse employment actions.

Notwithstanding the establishment of a prima facie case, a defendant can successfully rebut the prima facie retaliation case by producing legitimate nondiscriminatory reasons for its adverse employment actions. Here, the defendant has produced the three specific reasons that were stated in its filing with the CHRO and two additional reasons, i.e. the 1999 child labor law violations and the alleged hepatitis incident. Thus, the burden shifts back to the plaintiff to prove that the defendant engaged in intentional discrimination.

The summary in Part I of the plaintiff's evidence in support of his factual contentions reflects that the plaintiff has created a genuine issue of material fact with respect to whether each of the defendant's proffered reasons are false and a pretext for discrimination. For this reason alone, the defendant's motion should be denied. See St. Mary's Honor Center, 509 U.S. at 511 ("The factfinder's disbelief of the reasons put forward by the defendant . . . may, together with the elements of the prima facie case, suffice to show intentional discrimination."). However, as noted in

<u>Bickerstaff</u>, the plaintiff is not required to prove the falsity of the defendant's proffered reasons.  <u>Bickerstaff</u>, 196 F.3d at 447.

### B.  Age Discrimination Claim (ADEA and CFEPA)

The defendant contends that there is no genuine issue of material fact as to whether the plaintiff's age was a motivating factor in the decision to terminate his employment. The ADEA makes it unlawful for an employer "to discharge . . . or otherwise discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment because of such individual's age."  29 U.S.C.A. § 623(a)(1) (West 1999 & Supp. 2005).  The CFEPA proscribes age discrimination in substantially the same manner.  It makes it unlawful for an employer "to discharge . . . any individual or to discriminate against such individual in compensation or in terms, conditions or privileges of employment because of the individual's . . . age . . . ."  Conn. Gen. Stat. Ann. § 46a-60(a)(1) (West 2004 & Supp. 2005).

The defendant makes two arguments.  First, it contends that the plaintiff has failed to adduce any facts to show that the circumstances of his discharge give rise to any inference of discrimination, which is necessary in order for the plaintiff to meet his initial burden under <u>McDonnell Douglas</u>

Corp. v. Green, 411 U.S. 792 (1973), as that case has been
applied to ADEA claims.  See, e.g., Roge v. NYP Holdings, Inc.,
257 F.3d 164, 168 (2d Cir. 2001) (requiring, under McDonnell
Douglas, the age discrimination plaintiff to establish its
prima facie case by proving that (1) the plaintiff was a member
of the protected class; (2) he was qualified for the position;
(3) he suffered an adverse employment action; and (4) the
circumstances of the adverse action give rise to an inference
of age discrimination).

    Second, the defendant contends that even if the plaintiff
can establish a prima facie case of age discrimination, he
cannot also meet the requirement under McDonnell Douglas that
he counter the defendant's legitimate nondiscriminatory
business reasons for the discharge with facts that demonstrate
that the defendant's proffered reasons are pretextual and that
the discharge was actually motivated by discrimination.  See
Roge, 257 F.3d at 168 (citing Reeves v. Sanderson Plumbing
Prods., Inc., 530 U.S. 133, 143 (2000)).

    The court finds neither of these arguments persuasive.  The
plaintiff has met his minimal, initial burden of setting forth
facts that establish a prima facie case of age discrimination.
See Zimmerman v. Assocs. First Capital Corp., 251 F.3d 376, 381
(2d Cir. 2001) ("[The Second Circuit has] characterized the

evidence necessary to satisfy this initial burden as 'minimal' and
'*de minimus*' . . . .").  The plaintiff has met his burden with
respect to the first three elements of a prima facie case.  He has
produced evidence that he was 51 years old during the relevant
time period, that he was qualified for the district manager
position, and that he was subjected to an adverse employment
action.  In any event, the focus of the defendant's argument is
the fourth element, namely, whether the plaintiff has shown that
the circumstances of his discharge give rise to an inference of
discrimination.  The court finds that the plaintiff has done so.

The plaintiff has produced evidence that at the time of the
reorganization Maglioli reassigned the restaurants that were in
the plaintiff's district to district managers who where younger
than the plaintiff.  The evidence also reflects that the other
district managers from the plaintiff's former district, who were
younger than him, were reassigned to stores within a dramatically
closer average driving distance than that of the plaintiff.
Starting in September of 2000 -- the month following the
plaintiff's termination -- and for the remainder of 2000, the
defendant hired four district managers, each of whom were at least
ten years younger than the plaintiff.  Following the plaintiff's
termination, the defendant reassigned the plaintiff's duties to
younger district managers in his region.  These circumstances give

rise to an inference of age discrimination.

The defendant provides legitimate, nondiscriminatory reasons for discharging the plaintiff.  However, as noted above, the plaintiff has created a genuine issue of material fact with respect to whether each of the defendant's proffered reasons are false and a pretext for discrimination.  Accordingly, the defendant is not entitled to summary judgment on the plaintiff's ADEA claim.

The framework used to analyze age discrimination claims under the ADEA applies equally to the analysis of age discrimination claims brought under the CFEPA.  See Levy v. Comm'n on Human Rights and Opportunities, 236 Conn. 96, 103 (1996).  Accordingly, for the reasons stated above with respect to the plaintiff's ADEA claim, the court concludes that the defendant is not entitled to summary judgment on the plaintiff's CFEPA claim.

**C.  Disability Discrimination Claim (ADA and CFEPA)**

The plaintiff contends that the defendant terminated him in violation of the ADA and the CFEPA.  Courts analyze ADA discrimination claims under the McDonnell Douglas burden-shifting framework.  See Heyman v. Queens Vill. Comm. for Mental Health, 198 F.3d 68, 72 (2d Cir. 1999).  In order to establish a prima facie case of disability discrimination, a plaintiff must demonstrate that "(1) his employer is subject to the ADA; (2) he

was disabled within the meaning of the ADA; (3) he was otherwise qualified to perform the essential functions of his job, with or without reasonable accommodation; and (4) he suffered an adverse employment action because of his disability."  Cameron v. Cmty. Aid for Retarded Children, Inc., 335 F.3d 60, 63 (2d Cir. 2003).

In his opposition memorandum the plaintiff implicitly concedes that it is not prostate cancer which is the disability at issue for purposes of his ADA disability discrimination claim. Rather, the plaintiff focuses upon his post-operative urinary incontinence and erectile dysfunction -- conditions which resulted from his prostate surgery and which were present during the period in which the defendant took adverse employment actions against the plaintiff.  The plaintiff claims that to some degree his erectile dysfunction is a permanent disability.

While the parties dispute whether the plaintiff's erectile dysfunction satisfies the ADA's definition of a disability, the court does not need to reach this issue because the plaintiff has failed to create a genuine issue of material fact as to whether the defendant took adverse action against him "because of" his urinary incontinence and erectile dysfunction.

In order to sustain his burden under this fourth element of an ADA discrimination claim, the plaintiff must demonstrate at a minimum that

"the employer . . . [has] knowledge of the disability." *Kolivas v. Credit Agricole*, [No. 95 Civ. 5662(DLC),] 1996 WL 684167, *3 (S.D.N.Y. [Nov. 26, 1996]); *See also Monette v. Electronic Data Sys. Corp.*, 90 F.3d 1173, 1186, n. 13 (6th Cir. 1996) (plaintiff must show employer had knowledge of disability); *Morisky v. Broward County*, 80 F.3d 445, 448 (11th Cir. 1996) (plaintiff can not prove discrimination without showing employer knew of disability); *Hedberg v. Indiana Bell Telephone Co.*, 47 F.3d 928, 931-934 (7th Cir. 1995) (employer must have knowledge of disability in order to impose liability under ADA); *Estwick v. U.S. Air Shuttle*, 950 F.Supp. 493, 503 (E.D.N.Y. 1996) ("plaintiff must present some evidence that the employer knew that the plaintiff suffered from a disability").

<u>Adams v. Rochester Gen. Hosp.</u>, 977 F. Supp. 226, 236 (W.D.N.Y. 1997). Here, the plaintiff has neither alleged nor provided evidence that the defendant had knowledge of the plaintiff's urinary incontinence and/or erectile dysfunction when it took an adverse action against the plaintiff. Accordingly, the defendant is entitled to judgment as a matter of law on the plaintiff's ADA claim.

CFEPA makes it unlawful for an employer "to discharge from employment any individual or to discriminate against such individual . . . in terms, conditions or privileges of employment <u>because</u> <u>of</u> the individual's . . . physical disability . . . ." Conn. Gen. Stat. Ann. § 46a-60(a)(1) (West 2004 & Supp. 2005) (emphasis added). Thus, like the ADA, CFEPA requires that the defendant's adverse actions be based on the plaintiff's

disability.  Because the plaintiff has failed to produce evidence
that the defendant knew of the plaintiff's urinary incontinence
and/or erectile dysfunction at the time it took an adverse
employment action, there is no genuine issue of material fact as
to whether an adverse employment action was taken because of the
plaintiff's disability.[1]  Accordingly, the defendant is entitled to
judgment as a matter of law on the plaintiff's CFEPA claim.

**IV.  <u>Conclusion</u>**

For the reasons stated above, the defendant's Motion for
Summary Judgment (Doc. No. 13) is hereby GRANTED in part and
DENIED in part.  Judgment shall enter in favor of the defendant on
Count Three, i.e. the plaintiff's ADA claim, and that part of
Count Four that comprises the plaintiff's CFEPA disability claim;
the CFEPA age claim in Count Four remains.

It is so ordered.

Dated this 28th of September 2005, at Hartford, Connecticut.

/s/AWT

Alvin W. Thompson
United States District Judge

---

[1]While it is established that CFEPA defines disability more
broadly than the ADA, <u>see</u> <u>Beason v. United Techs. Corp.</u>, 337 F.3d
271, 278 (2d Cir. 2003), that is not a material consideration
here because the absence of a causal connection is dispositive of
the plaintiff's CFEPA claim.